J. Henk Taylor (016321)
**WARNER ANGLE HALLAM
  JACKSON & FORMANEK PLC**
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Tel.: (602) 264-7101
Fax: (602) 234-0419
Email: htaylor@warnerangle.com

Joshua Wurtzel (*pro hac vice
application to be submitted*)
Jessica R. Caterina (*pro hac vice
application to be submitted*)
John Moore (*pro hac vice application
to be submitted*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway, 19th Floor
New York, New York 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
Email: jwurtzel@schlamstone.com
Email: jcaterina@schlamstone.com
Email: jmoore@schlamstone.com

*Attorneys for Defendants and
Counterclaim-Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| Reliance Hospitality LLC, d/b/a Reliance Hotel Group, a Delaware limited liability company,<br><br>           Plaintiff,<br><br>          v.<br><br>2930 Waterfront Parkway IN LLC, d/b/a Waterfront Hotel & Conference Center; Crown South Hill Owners LLC, d/b/a Crowne Plaza Pittsburgh South; 500 Mansfield Avenue Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Green Tree; 101 Mall Boulevard Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Monroeville Convention Center; and 383 South Center Street, Windsor Locks LLC, d/b/a Ramada by Wyndham Windsor Locks,<br><br>          Defendants. | No. 2:23-cv-00229-DJH<br><br>**SECOND AMENDED ANSWER TO COMPLAINT<br><u>WITH COUNTERCLAIMS</u>** |

1

2930 Waterfront Parkway IN LLC, d/b/a Waterfront Hotel & Conference Center; Crown South Hill Owners LLC, d/b/a Crowne Plaza Pittsburgh South; 500 Mansfield Avenue Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Green Tree; 101 Mall Boulevard Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Monroeville Convention Center; and 383 South Center Street, Windsor Locks LLC, d/b/a Ramada by Wyndham Windsor Locks,

       Counterclaim-Plaintiffs,

           v.

Reliance Hospitality LLC, d/b/a Reliance Hotel Group,

       Counterclaim-Defendant.

Defendants 2930 Waterfront Parkway IN LLC, d/b/a Waterfront Hotel & Conference Center ("2930 Waterfront"); Crown South Hill Owners LLC, d/b/a Crowne Plaza Pittsburgh South ("Crown South Hill"); 500 Mansfield Avenue Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Green Tree ("500 Mansfield"); 101 Mall Boulevard Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Monroeville Convention Center ("101 Mall"); and 383 South Center Street, Windsor Locks LLC, d/b/a Ramada by Wyndham Windsor Locks ("383 South Center," and together with 2930 Waterfront, Crown South Hill, 500 Mansfield, and 101 Mall, the "Owners"), by their undersigned attorneys, as and for its Amended Answer to the Complaint, filed by Plaintiff Reliance Hospitality LLC, d/b/a Reliance Hotel Group ("Plaintiff") in the above-captioned action, with Counterclaim, respectfully states as follows:

Except as expressly admitted in this Amended Answer, Defendants deny each and every allegation contained or implied anywhere in the Complaint, whether in the body,

2

title, headings, sub-headings, or otherwise. To the extent Defendants use terms herein which are defined in the Complaint, that use is not an acknowledgment or admission of any characterization Plaintiff may ascribe to the defined term. Defendants further deny that Plaintiff is entitled to any relief. Defendants expressly reserve the right to amend and/or supplement this Amended Answer as may be necessary.

## ANSWER TO INTRODUCTION

1. Defendants deny the allegations made in Paragraph 1 of the Complaint.

## ANSWER TO PARTIES AND JURISDICTION

2. Defendants admit the allegations made in Paragraph 2 of the Complaint.

3. Defendants admit the allegations made in Paragraph 3 of the Complaint.

4. Defendants admit the allegations made in Paragraph 4 of the Complaint.

5. Defendants admit the allegations made in Paragraph 5 of the Complaint.

6. Defendants admit the allegations made in Paragraph 6 of the Complaint.

7. Defendants admit the allegations made in Paragraph 7 of the Complaint.

8. Defendants admit the allegations made in Paragraph 8 of the Complaint.

9. Defendants admit the allegations made in Paragraph 9 of the Complaint.

10. Defendants admit the allegations made in Paragraph 10 of the Complaint.

11. Defendants admit the allegations made in Paragraph 11 of the Complaint.

12. Defendants admit the allegations made in Paragraph 12 of the Complaint.

13. Defendants admit the allegations made in Paragraph 13 of the Complaint.

14. Defendants admit the allegations made in Paragraph 14 of the Complaint.

15. Defendants deny the allegations made in Paragraph 15 of the Complaint.

16. The allegations made in Paragraph 16 of the Complaint purport to describe and/or summarize the contents of certain Hotel Management Agreements

("Agreements"), which speak for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 16 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

17. Defendants admit the allegations made in Paragraph 17 of the Complaint.

18. The allegations made in Paragraph 18 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speak for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 18 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

19. The allegations made in Paragraph 19 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speak for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 19 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

20. Defendants admit the allegations made in Paragraph 20 of the Complaint.

21. Paragraph 21 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 21 of the Complaint.

22. Paragraph 22 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants do not contest that jurisdiction and venue are appropriate in this action.

4

<u>ANSWER TO FACTUAL BACKGROUND</u>

23. The allegations made in Paragraph 23 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 23 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

24. The allegations made in Paragraph 24 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 24 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

25. The allegations made in Paragraph 25 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 25 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

26. The allegations made in Paragraph 26 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 26 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

27. The allegations made in Paragraph 27 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their

complete and accurate contents. To the extent that the allegations made in Paragraph 27 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

28. The allegations made in Paragraph 28 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 28 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

29. The allegations made in Paragraph 29 of the Complaint purport to describe and/or summarize the contents of the Agreements, which speaks for themselves. Defendants respectfully refer the Court and Plaintiff to the entire Agreements for their complete and accurate contents. To the extent that the allegations made in Paragraph 29 of the Complaint are inconsistent with the Agreements, Defendants deny the allegations.

30. Defendants deny the allegations made in Paragraph 30 of the Complaint.

31. Defendants deny the allegations made in Paragraph 31 of the Complaint.

32. Defendants deny the allegations made in Paragraph 32 of the Complaint.

33. Defendants deny the allegations made in Paragraph 33 of the Complaint.

ANSWER TO COUNT I: BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAITH DEALING: 2930 WATERFRONT PARKWAY IN, LLC

34. Defendants hereby incorporate all preceding paragraphs by reference as if they were restated here.

35. Paragraph 35 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 35 of the Complaint.

36. Paragraph 36 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 36 of the Complaint.

37. Defendants deny the allegations made in Paragraph 37 of the Complaint.

38. Defendants deny the allegations made in Paragraph 38 of the Complaint.

39. Defendants deny the allegations made in Paragraph 39 of the Complaint.

40. Defendants deny the allegations made in Paragraph 40 of the Complaint.

<u>ANSWER TO COUNT II: BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAITH DEALING: CROWN SOUTH HILL OWNERS, LLC</u>

41. Defendants hereby incorporate all preceding paragraphs by reference as if they were restated here.

42. Paragraph 42 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 42 of the Complaint.

43. Paragraph 43 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 43 of the Complaint.

44. Defendants deny the allegations made in Paragraph 44 of the Complaint.

45. Defendants deny the allegations made in Paragraph 45 of the Complaint.

46. Defendants deny the allegations made in Paragraph 46 of the Complaint.

47. Defendants deny the allegations made in Paragraph 47 of the Complaint.

<u>ANSWER TO COUNT III: BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAITH DEALING: 500 MANSFIELD AVENUE OWNER, LLC</u>

48.     Defendants hereby incorporate all preceding paragraphs by reference as if they were restated here.

49.     Paragraph 49 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 49 of the Complaint.

50.     Paragraph 50 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 50 of the Complaint.

51.     Defendants deny the allegations made in Paragraph 51 of the Complaint.

52.     Defendants deny the allegations made in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations made in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations made in Paragraph 54 of the Complaint.

<u>ANSWER TO COUNT IV: BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAITH DEALING: 101 MALL BOULEVARD OWNERS, LLC</u>

55.     Defendants hereby incorporate all preceding paragraphs by reference as if they were restated here.

56.     Paragraph 56 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 56 of the Complaint.

57. Paragraph 57 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 57 of the Complaint.

58. Defendants deny the allegations made in Paragraph 58 of the Complaint.

59. Defendants deny the allegations made in Paragraph 59 of the Complaint.

60. Defendants deny the allegations made in Paragraph 60 of the Complaint.

61. Defendants deny the allegations made in Paragraph 61 of the Complaint.

ANSWER TO COUNT V: BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAITH DEALING: 383 SOUTH CENTER ST. WINDSOR LOCKS, LLC

62. Defendants hereby incorporate all preceding paragraphs by reference as if they were restated here.

63. Paragraph 63 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 63 of the Complaint.

64. Paragraph 64 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, Defendants admit the allegations made in Paragraph 64 of the Complaint.

65. Defendants deny the allegations made in Paragraph 65 of the Complaint.

66. Defendants deny the allegations made in Paragraph 66 of the Complaint.

67. Defendants deny the allegations made in Paragraph 67 of the Complaint.

68. Defendants deny the allegations made in Paragraph 68 of the Complaint.

## ANSWER TO PRAYER FOR RELIEF

The paragraph on page 8 of the Complaint beginning with "WHEREFORE," and all subsequent paragraphs denoted A-D, state Plaintiff's request for relief, to which no response is required. To the extent a response is required, Defendants deny that Plaintiff is entitled to the requested relief, or to any relief.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative and other defenses without assuming any burden of production or proof that it would not otherwise have.

## FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiff's claim is barred by equitable principles, including, but not limited to, waiver, estoppel, laches, the after-acquired evidence doctrine, the unclean hands doctrine, and the election of remedies doctrine.

## THIRD DEFENSE

Plaintiff's claim is barred by the doctrines of set-off and recoupment.

## FOURTH DEFENSE

Plaintiff's claim is barred by the applicable statutes of limitations.

## FIFTH DEFENSE

Plaintiff's claim is barred because, at all relevant times, Defendants acted in good faith and have not violated any rights secured to Plaintiff under any federal, state, or local rules, regulations, or guidelines.

## SIXTH DEFENSE

Plaintiff's claim is barred to the extent that Plaintiff failed to mitigate or avoid the damages alleged in the Complaint.

## SEVENTH DEFENSE

Plaintiff's claim is barred because Plaintiff suffered no injuries or damages as a result of the alleged acts or omissions by Defendants in the Complaint.

## EIGHTH DEFENSE

Plaintiff's claim is barred because, at all relevant times, Defendants acted in a manner that was proper, reasonable, and lawful.

## NINTH DEFENSE

To the extent Plaintiff seeks punitive damages, Plaintiff's claim for punitive damages is barred by the United States Constitution, the Arizona Constitution, or by state or local law.

## TENTH DEFENSE

Plaintiff's claim is barred because the Agreements were a binding and enforceable contract between Defendants and Plaintiff, and Plaintiff breached the Agreements.

11

## ELEVENTH DEFENSE

Plaintiff's claim is barred because Plaintiff received all amounts that it claims is due to it as a result of funds it received through the federal Government's PPP and other programs.

## RESERVATION OF RIGHTS

Defendants reserve the right to amend this Answer, to add additional defenses, to withdraw defenses, to add counterclaims, and to join additional parties.

## COUNTERCLAIM PLAINTIFFS' COUNTERCLAIM

Defendants and Counterclaim-Plaintiffs 2930 Waterfront Parkway IN LLC, d/b/a Waterfront Hotel & Conference Center ("2930 Waterfront"); Crown South Hill Owners LLC, d/b/a Crowne Plaza Pittsburgh South ("Crown South Hill"); 500 Mansfield Avenue Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Green Tree ("500 Mansfield"); 101 Mall Boulevard Owner LLC, d/b/a Doubletree by Hilton Pittsburgh-Monroeville Convention Center ("101 Mall"); and 383 South Center Street, Windsor Locks LLC, d/b/a Ramada by Wyndham Windsor Locks ("383 South Center," and together with 5251 S. Julian, 2930 Waterfront, Crown South Hill, 500 Mansfield, and 101 Mall, the "Owners"), by and through their counsel, assert the following causes of action against Plaintiff and Counterclaim-Defendant Reliance Hospitality LLC, d/b/a Reliance Hotel Group ("Reliance"), and allege as follows:

## NATURE OF ACTION

1.     This counterclaim arises out of Reliance's gross and negligent mismanagement of five hotels that Owners engaged it to manage. Indeed, as explained below, Reliance's gross mismanagement led to substantially reduced revenues at all five of these hotels and many other serious problems, which Owners are still attempting to resolve despite having terminated Reliance months ago.

2.     Between September 2019 and August 2021, Owners engaged Reliance to manage five hotels that they owed. And given that Reliance managed (and was hired to manage) these five hotels primarily through the COVID-19 pandemic—which was one of the worst markets for hotels in recent history—Owners placed their faith in the hands-on, attentive hotel-management services that Reliance claimed it provided.

13

3. But by mid-2021, Owners discovered that Reliance had grossly mismanaged each of these five hotels—leading to substantially reduced revenue, compared to peer hotels, for each of them.

4. Specifically, among other things, Reliance failed to submit an insurance claim (and then lied about it), failed to secure liquor licenses, disregarded Owners' express instructions about hiring, failed to provide profit-and-loss statements, and failed to supervise the employees it hired—leading to, in some cases, serious theft and other malfeasance by unscrupulous employees.

5. Owners thus bring this counterclaim to recover for the substantial damage that Reliance's gross and negligent mismanagement of these hotels has caused them.

### THE PARTIES

6. 2930 Waterfront is an Indiana limited liability company, and is the owner of the hotel known as the Waterfront Hotel & Conference Center, located at 2930 Waterfront Parkway West Drive, Indianapolis, Indiana 46214. 2930 Waterfront's members are limited liability companies, the members of which are natural persons who are citizens of Israel and New York.

7. Crown South Hill is a Delaware limited liability company, and is the owner of the hotel known as the Crowne Plaza Pittsburgh South, located at 164 Fort Couch Road, Pittsburgh, Pennsylvania 15241. Crown South Hill's members are limited liability companies, the members of which are natural persons who are citizens of New York. Thus, Crown South Hill is a citizen of New York.

8. 500 Mansfield is a Pennsylvania limited liability company, and is the owner of the hotel known as the Doubletree by Hilton Pittsburgh-Green Tree, located at 500 Mansfield Avenue, Pittsburgh, Pennsylvania 15205. 500 Mansfield's members are

14

limited liability companies, the members of which are natural persons who are citizens of New York. Thus, 500 Mansfield is a citizen of New York.

9. 101 Mall is a Pennsylvania limited liability company, and is the owner of the hotel known as the Doubletree by Hilton Pittsburgh-Monroeville Convention Center, located at 101 Mall Boulevard, Monroeville, Pennsylvania 15146. 101 Mall's members are limited liability companies, the members of which are natural persons who are citizens of Israel and New York. Thus, 101 Mall is a citizen of Israel and New York.

10. 383 South Center is a Connecticut limited liability company, and is the owner of the hotel known as the Ramada by Wyndham Windsor Locks, located at 383 S. Center Street, Windsor Locks, Connecticut 06096. 383 South Center's members are limited liability companies, the members of which are natural persons who are citizens of New York. Thus, 383 South Center is a citizen of New York.

11. Reliance is a Delaware limited liability company with corporate headquarters in Phoenix, Arizona, and primarily conducts its business in Phoenix, Arizona. Upon information and belief, Reliance has three members, who, upon information and belief, are natural persons and who are citizens of Arizona. Thus, Reliance is a citizen of Arizona.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because there is diversity of citizenship and the matter in controversy exceeds $75,000.

13. Jurisdiction and venue are moreover proper in this Court because Reliance has continuous and systematic contacts with Arizona.

**FACTUAL ALLEGATIONS**

**A.     The Owners Execute Hotel Management Agreements With Reliance**

14.     Reliance is a self-described "full-service hospitality management company," and it boasts that it is "committed to excellent service resulting in exceptional financial results" for its clients.

15.     Looking to develop a long-term management relationship with Reliance, and believing that Reliance would provide the hands-on, attentive hotel-management services that it promised, the Owners—which are under varying degrees of common or overlapping ownership—executed hotel-management agreements with Reliance.

16.     Specifically, on December 17, 2019, 383 South Center entered into a hotel-management agreement with Reliance (the "383 South Center HMA") for management of the Ramada by Wyndham Windsor Locks in Windsor Locks, Connecticut. A copy of this agreement is attached as Exhibit A.

17.     On January 15, 2020, 101 Mall entered into a hotel-management agreement with Reliance (the "101 Mall HMA") for management of the Doubletree by Hilton Pittsburgh-Monroeville Convention Center in Monroeville, Pennsylvania. A copy of this agreement is attached as Exhibit B.

18.     On June 25, 2020, 2930 Waterfront entered into a hotel-management agreement with Reliance (the "2930 Waterfront HMA") for management of the Waterfront Hotel & Conference Center in Indianapolis, Indiana. A copy of this agreement is attached as Exhibit C.

19.     On June 21, 2021, 500 Mansfield entered into a hotel-management agreement with Reliance (the "500 Mansfield HMA") for management of the Doubletree

16

by Hilton Pittsburgh-Green Tree in Pittsburgh, Pennsylvania. A copy of this agreement is attached as Exhibit D.

20. On August 24, 2021, Crown South Hill entered into a hotel-management agreement with Reliance (the "Crown South Hill HMA," and together with the 5251 S. Julian HMA, the 383 South Center GMA, the 101 Mall HMA, the 2930 Waterfront HMA, and the 500 Mansfield HMA, the "HMAs") for management of the Crowne Plaza Pittsburgh South in Pittsburgh, Pennsylvania. A copy of this agreement is attached as Exhibit E.

21. The HMAs are all substantially similar to each other.

22. Under section 1.1 of the HMAs, Reliance was required to, among other things, "direct, supervise, manage and operate the Hotel in all aspects in an efficient and economical manner consistent with Owners of a comparable size, class and level of service having similar facilities."

23. And also under section 1.1 of the HMAs, Reliance was to serve as the Owners' agents, and was "responsible for the proper and efficient operation" of each hotel.

24. Under section 1.1(a) of the HMAs, Reliance was required to "[r]ecruit, relocate, pay, supervise and discharge all employees and personnel necessary for the operation of the Hotel in accordance with the Personnel Employment Policies."

25. Under section 1.1(f) of the HMAs, Reliance was required to "[e]stablish and revise, as necessary, administrative policies and procedures including, without limitation, policies and procedures for the control of revenue and expenditures, for the purchase of Operating Supplies and Inventory, and services, for the control of credit, and for the scheduling of maintenance."

26. Under section 1.1(j) of the HMAs, Reliance was required to "[m]aintain the Operating Account" as required by the HMAs.

27. Under section 1.1(k) of the HMAs, Reliance was required to "[p]repare and deliver to" the Owners the "Annual Business Plans, Monthly Reports, and such other information as required by" the HMAs.

28. Under section 1.1(n) of the HMAs, Reliance was required to "[p]rovide such reasonable information" as the Owners "may request in connection with" each hotel's "procurement and maintenance of the insurance."

29. Under section 1.1(o) of the HMAs, Reliance was required to "[k]eep" each Hotel "advised of all major policy matters affecting the Hotel."

30. Under section 1.1(p) of the HMAs, Reliance was required to, "[t]o the extent within the control of Manager, operate the Hotel in compliance with the Franchise Agreement and the Mortgage."

31. Under section 1.2 of the HMAs, Reliance had discretion and control over all personnel matters, but the Owners were entitled to an "adequate opportunity to review, and interview both the General Manager, and Director of Sales positions" at each hotel.

32. Under section 6.1 of the HMAs, Reliance was required to "keep full and adequate books of account and other records (collectively, the 'Books and Records') as are necessary to reflect all Pre-Opening Expenses, all other Operating Expenses, all Total Revenue, and all other costs and results of the operation of the Hotel on an accrual basis, all substantially in accordance with the Uniform System."

33. And Reliance was further required to make all Books and Records "available to Owner and its representative's at all reasonable times for examination,

18

inspection and transcription." All Books and Records were to be "property of Owner," and upon termination of the HMAs, were required to be "turned over to Owner to ensure the orderly continuation of the operation of the Hotel."

34. Under section 6.2 of the HMAs, Reliance was required to "deliver to Owner, within twenty (20) working days after the end of each Accounting Period, a balance sheet and profit and loss statement showing the results of operation of the Hotel for that Accounting Period and for that Fiscal Year through the end of that Accounting Period, as compared to the Operating Budget (a 'Monthly Report')."

35. Under section 6.4 of the HMAs, Reliance was required to "provide to Owner, on an agreed upon schedule, the records required to process payments directly on any expenses incurred by the Hotel."

36. Under section 7.1 of the HMAs, in exchange for its management services, each Owner agreed to pay Reliance a management fee. This management fee varied for each hotel, though was generally a percentage (*e.g.*, 2.5%) of hotel revenue—without regard to profit—with a higher percentage due if revenues exceeded a specified threshold.

37. Under sections 2.1, 2.2, 9.1, and 9.2 of the HMAs, each HMA was to last for a three-year term and, unless cancelled, automatically renew after that—though either party could terminate immediately upon the other's "gross negligence," "willful misconduct," "fraud," and other specified "Termination Events," or, under section 2.3 in most of the HMAs, for any reason upon 30 days' notice.

38. Under section 9.6 of the HMAs, for 30 days after the date of termination of any HMA, Reliance was required to "reasonably cooperate with Owner in the transition and orderly transfer of management of the Hotel to Owner or Owner's designated agent,"

19

including preparing a "final accounting" of hotel operations and disbursing funds held by it on Owner's behalf to Owner (less a reasonable reserve).

39. Under section 9.7 of the HMAs, upon termination, Reliance was entitled to remove and retain its "Manager Software," but was required to provide to Owner the "non-proprietary data regarding the Hotel and Hotel-specific operational matters, such as Hotel service contracts, Hotel maintenance and financial records, and advance Hotel room reservations."

40. Under section 13.2 of the HMAs, Reliance is required to "indemnify, defend and hold harmless Owner, and its respective officers, directors, shareholders, employees, representatives, and agents (collectively, the 'Owner Indemnities') from and against any and all losses, costs, damages, liabilities, claims, demands, actions, and causes of action, and expenses whatsoever (including, without limitation, reasonable attorneys' fees and court expenses), incurred by Owner Indemnities or any of them" as a result of Reliance's "gross negligence, willful misconduct or fraud."

41. Under section 14.7 of the HMAs, the HMAs are governed by Arizona law.

**B. Reliance Breaches the HMAs By Grossly and Negligently Mismanaging the <u>Owners</u>**

42. Much of the time that Reliance was managing Owners' hotels—and the entire time for some of the hotels—was after the COVID-19 pandemic struck this country and the world, resulting in some of the worst market conditions for hotels in recent history. Owners thus relied on Reliance to shepherd them through these difficult times, and they put their faith in Reliance's claimed abilities and attention to detail.

43. But as later became obvious, that faith was misplaced. Indeed, as explained below, in mid-2021, Owners discovered that Reliance had mismanaged each of the five

20

hotels they were engaged to manage to the point that each had substantially reduced revenues compared to peer hotels. And as further explained below, Reliance's mismanagement of each hotel was grossly negligent, and in some cases, based on willful misconduct.

> **i.** **Reliance Breaches the 500 Mansfield HMA at the Doubletree by Hilton Pittsburgh-Green Tree in Pittsburgh, Pennsylvania**

44. One of Reliance's first major tasks at this hotel was to work with a law firm that 500 Mansfield had engaged to apply for a liquor license for the hotel, the Doubletree by Hilton Pittsburgh-Green Tree. (Though this was before the 500 Mansfield HMA was executed, Reliance orally agreed to handle this task, in exchange for 500 Mansfield moving forward with Reliance as its hotel-management firm for this hotel.)

45. 500 Mansfield sent a retainer payment to this law firm and put Reliance in charge of seeing this process through. Reliance accepted this delegation of responsibility.

46. But unknown to 500 Mansfield at that time, Reliance completely ignored the law firm that 500 Mansfield had hired, and failed to provide the paperwork and other documents that this law firm requested to secure a liquor license.

47. When it came time for 500 Mansfield to close on its purchase of the hotel, 500 Mansfield learned for the first time that Reliance had completely dropped the ball and had not applied for a liquor license for the hotel at all—contrary to its agreement to handle this task.

48. Further, Reliance also failed to inform 500 Mansfield or otherwise notice that the then-existing owner of the hotel (before 500 Mansfield) was operating with the prior owner's (the owner before 500 Mansfield's predecessor) liquor license. Thus,

without a liquor license of its own, 500 Mansfield was required to pay $20,000 per month to this prior owner to get them to agree to a new, interim agreement.

49. 500 Mansfield paid this amount for the first month after closing on the purchase of this hotel. This allowed 500 Mansfield to serve liquor for this first month. But given that the monthly cost of this interim agreement to allow 500 Mansfield to serve liquor was more than this hotel was earning, after this first month, 500 Mansfield stopping paying this $20,000 monthly fee and stopped serving liquor.

50. Though it has now obtained its own liquor license (after taking over this process from Reliance), during the pendency of the application process for that license, 500 Mansfield was unable to serve liquor at its hotel other than through third-party vendors (which have their own liquor licenses).

51. Had Reliance properly secured a liquor license for the hotel when 500 Mansfield initially told it to do so, 500 Mansfield would have been able to serve liquor at its hotel since June 2021.

52. Reliance also lost (or claimed to have lost) financial information related to the hotel and failed to timely provide profit-and-loss statements to 500 Mansfield, in breach of the 500 Mansfield HMA.

53. Further, in August 2021, a representative of 500 Mansfield showed up at the hotel for a surprise inspection—only to be told that the hotel had no available rooms. But upon further investigation, 500 Mansfield discovered that the reason the hotel had no available rooms was because 250 of the hotel's 460 rooms were out of order because they hadn't been cleaned.

54. 500 Mansfield representative's visit also revealed gross mismanagement of the hotel's restaurant.

55. Indeed, Reliance's employees initially refused to serve a family of guests staying at the hotel for no apparent reason—and continued to refuse to serve this family until a representative of 500 Mansfield intervened and demanded that they be served. This was willful misconduct by Reliance.

56. 500 Mansfield's representatives also discovered that the hotel restaurant's expenses didn't match up, revenues were surprisingly (and, given market conditions, unexpectedly) low, and the reports that Reliance prepared did not make sense—all of which suggested either gross mismanagement or theft, or both.

57. After seeing how Reliance grossly and negligently mismanaged 500 Mansfield's hotel, Owners' representatives began investigating Reliance's management of the other hotels described above.

**ii.    Reliance Breaches the 101 Mall HMA at the Doubletree by Hilton Pittsburgh-Monroeville Convention Center in Monroeville, <u>Pennsylvania</u>**

58. Between July and September 2021, Reliance went through four separate general managers at this hotel.

59. And one of these general managers was someone that 101 Mall expressly told Reliance not to hire. In breach of the 101 Mall HMA, Reliance thus deliberately disregarded 101 Mall's instruction on this.

60. Reliance also failed to visit the hotel on a monthly or otherwise regular basis.

61. Similar to what it did with 500 Mansfield's Doubletree Pittsburgh Green Tree, Reliance also failed to secure a liquor license for this hotel, despite 101 Mall having retained an attorney for this purpose. Indeed, just like with the Doubletree Pittsburg

23

Green Tree, Reliance failed to respond to this attorney or otherwise provide the documents requested by them.

62. Reliance further failed to provide, or otherwise concealed, the full amount of PPP money that 101 Mall received from the federal Government.

### iii. Reliance Breaches the 2930 Waterfront HMA at the Waterfront Hotel & Conference Center in Indianapolis, Indiana

63. At this hotel, Reliance grossly mismanaged the hotel staff on site.

64. And Reliance again failed to provide, or otherwise concealed, the full amount of PPP money that 2930 Waterfront received from the federal Government.

65. Further, like above, Reliance also failed to provide 2930 Waterfront with a full list of the hotel's expenses.

66. Moreover, Reliance failed to hire Firewatch, a company that provides back-up fire security and monitoring in the event a hotel's fire-alarm system goes down. Having Firewatch in place is critical for a hotel, because it allows a hotel to continue operating—with Firewatch employees standing guard to watch out for fire—if a fire-alarm system suddenly stops working.

67. In March 2022, 2930 Waterfront learned that a fire panel at the hotel had broken down. This fire panel had apparently been broken for some time, and Reliance had been aware of—but did nothing about—it since it first learned of the issue in July 2021. This meant that the hotel's fire-alarm system didn't work at all, which put guests and staff at great risk of harm if there had been a fire (fortunately, there was not).

### iv. Reliance Breaches the 383 South Center HMA at the Ramada by Wyndham Windsor Locks in Windsor Locks, Connecticut

68. At this hotel, Reliance negligently or willfully failed to submit an insurance claim for a sewer line that broke in March 2021. Indeed, between March and June 2021,

24

Reliance repeatedly told 383 South Center that it had submitted this insurance claim. But this was a lie. And in July 2021, 383 South Center discovered that, contrary to its representations, Reliance had not submitted this insurance claim. This led to $70,000 in repair costs, which have not (to date) been covered by insurance, and a three-week closure of the hotel.

69. Reliance also hired a general manager who stole at least $100,000, and was not caught until April 2021. This same general manager—under the supposed supervision of Reliance—hired a contractor with whom he had an affair on site during work hours. Had Reliance properly supervised these employees, this theft and malfeasance could have been prevented.

70. Reliance also negligently allowed a sales manager to steal an additional $50,000 from the hotel.

71. And Reliance also negligently allowed a front-desk manager to steal additional money from the hotel.

72. Further, Reliance also hired hotel employees without 383 South Center's approval.

73. Moreover, Reliance again failed to provide, or otherwise concealed, the full amount of PPP money that 2930 Waterfront received from the federal Government.

74. Moreover, Reliance also grossly mismanaged the hotel restaurant, including causing a months-long delay in opening because of Reliance's and its employees' lack of preparedness.

**v.** **Reliance Breaches Each of the HMAs By Failing to Apply for Employee Retention Credits, or, in the Alternative, By Applying for and Receiving Employee Retention Credits and Improperly Keeping the Money for Itself**

75. Under Section 1.2(a), the Owners were responsible for depositing, into the

Operating Account (as part of the Operating Expenses), "the salary" and "payroll taxes" of "all Hotel Personnel for the Manager." Under section 1.1(a) of the HMAs, Reliance was required to then use this money to "pay . . . all employees and personnel necessary for the operation of the Hotel in accordance with the Personnel Employment Policies."

76. In other words, while it was Reliance's responsibility, as the employer, to pay the payroll taxes out of the Operating Account, it was the Owner's responsibility to fund the taxes (and all payroll expenses) in the first place.

77. While the Owners trusted Reliance to properly manage the payroll expenses per the terms of the HMAs, during the time the HMAs were in effect – i.e., during the height of the COVID-19 pandemic – it was common knowledge that companies could apply for Employee Retention Credits ("ERCs") funds to act as a credit against the employer's share of payroll taxes.

78. Specifically, ERCs (made available by the CARES Act) were refundable, federal tax credits against an employer's payroll taxes for businesses financially affected by the COVID-19 pandemic. To claim the tax credit, employers that had experienced a significant decline in revenue had to file certain forms with the Internal Revenue Service.

79. The purpose of the ERCs was to partially refund employers as an essential reward for keeping employees on payroll during the pandemic. Employers that paid wages to employees between March 12, 2020 and January 1, 2022 could get up to $26,000 per employee, even if they received PPP Funds.

80. Since the ERCs were a credit against the employer's share of payroll taxes, then the party responsible for the payroll taxes would be entitled to them. Because the HMAs (section 1.2(a)) required the Owners to fund payroll, including payroll taxes,

26

then any such credits would be owed to the Owners. Reliance served as just a passthrough entity in this regard.

81. However, despite the availability of ERC credits, Owners have never seen any proof that Reliance ever applied for them during the time the HMAs were in effect.. This was in breach of the HMAs, including, section 1.1., which required Reliance to, *inter alia*, "manage and operate the Hotel in all aspects in an efficient and economical manner" and to serve as the Owners' agents, "responsible for the proper and efficient operation" of each of the Hotels.

82. Alternatively, upon information and belief, Reliance did apply for, and did receive, ERC credits during the time the HMAs were in effect, and its retention of those credits constitutes a breach of the ERC because it is currently holding onto money that, as set forth above, Reliance is not legally entitled to.

83. Furthermore, on September 22, 2023, counsel for Reliance informed Owners' counsel that Reliance did, in fact, apply for ERCs but that it had not yet received any ERCs on account of the employees at any of the Hotels at issue. Taking Reliance at its word, to the extent that Reliance applied for ERCs *after* the HMAs were in effect, and has received (or may receive) funds that rightfully belong to Owners *after* the HMAs were in effect, then Reliance's retention of these funds makes it liable for unjust enrichment, in quantum meruit, and for money had and received. As set forth above, any credits or funds Reliance receives on behalf of its employees who worked at the Hotels during the time the HMAs were in effect rightfully belongs to Owners, because Owners are the ones who funded payroll and payroll taxes/expenses for Reliance's employees. If Reliance keeps these funds, it will have obtained a benefit at Owners' expense.

27

**C.** **The Owners Terminate the HMAs**

84. On September 10, 2021, 500 Mansfield and Crown South Hill terminated the 500 Mansfield HMA and the Crown South Hill HMA, respectively.

85. On January 7, 2022, 101 Mall and 383 South Center terminated the 101 Mall HMA and 383 South Center HMA, respectively.

86. In response, a few weeks later, Reliance terminated the 290 Waterfront HMA.

87. Despite being terminated or itself terminating the HMAs, Reliance refused to give the Owners profit-and-loss statements for the last quarter of 2021.

88. Further, upon information and belief, of the $840,000 Reliance received in PPP funds, the overwhelming majority was attributable to Owners' hotels' employees, and was required to be used to pay these employees and other expenses of Owners' hotels. But upon information and belief, based, in part, on Reliance's refusal to tell Owners how much it received in PPP funds or how long those funds would last, Reliance wrongfully diverted some of these funds to pay expenses for other hotels not owned by Owners. Alternatively, upon information and belief, Reliance underapplied for PPP funds for Owners' hotels employees and diverted PPP funds that should have otherwise gone to pay Owners' hotels' employees. Further, upon information and belief, Reliance already received the funds that it claims are due to it in this action through these PPP funds.

**FIRST CAUSE OF ACTION**
**(Breach of the 500 Mansfield HMA**
**and Oral Agreement to Secure Liquor**
**License, by 500 Mansfield Against Reliance)**

89. 500 Mansfield repeats the allegations above as if fully set forth here.

90. The 500 Mansfield HMA is a valid and binding contract between 500 Mansfield and Reliance.

28

91. The mutual exchange of promises in the 500 Mansfield HMA was sufficient consideration.

92. 500 Mansfield fully performed all of its material obligations under the 500 Mansfield HMA.

93. Reliance failed to perform its material obligations under the 500 Mansfield HMA as described in paragraphs 52–58 above.

94. Before executing the 500 Mansfield HMA, 500 Mansfield and Reliance entered into an oral agreement under which (i) Reliance agreed to secure a liquor license for 500 Mansfield at the Doubletree by Hilton Pittsburgh-Green Tree in Pittsburgh, Pennsylvania, and (ii) 500 Mansfield agreed to move for with Reliance as its hotel-management firm for this hotel.

95. This oral agreement was a valid and binding contract between 500 Mansfield and Reliance.

96. The mutual exchange of promises in this oral agreement was sufficient consideration.

97. 500 Mansfield fully performed all of its material obligations under this oral agreement.

98. Reliance failed to perform its material obligations under this oral agreement as described in paragraphs 44–51 above.

99. As a result of Reliance's material breach of the 500 Mansfield HMA and this oral agreement, 500 Mansfield suffered damages in an amount to be determined at trial; plus, under A.R.S. §§ 12-341 and 12-341.01 and section 13.2 of the 500 Mansfield HMA, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
### (Breach of the 101 Mall HMA,
### by 101 Mall Against Reliance)

100. 101 Mall repeats the allegations above as if fully set forth here.

101. The 101 Mall HMA is a valid and binding contract between 101 Mall and Reliance.

102. The mutual exchange of promises in the 101 Mall HMA was sufficient consideration.

103. 101 Mall fully performed all of its material obligations under the 101 Mall HMA.

104. Reliance failed to perform its material obligations under the 101 Mall HMA as described in paragraphs 59–64 above.

105. As a result of Reliance's material breach of the 101 Mall HMA, 101 Mall suffered damages in an amount to be determined at trial; plus, under A.R.S. §§ 12-341 and 12-341.01 and section 13.2 of the 101 Mall HMA, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest.

## THIRD CAUSE OF ACTION
### (Breach of the 2930 Waterfront HMA,
### by 2930 Waterfront Against Reliance)

106. 2930 Waterfront repeats the allegations above as if fully set forth here.

107. The 2930 Waterfront HMA is a valid and binding contract between 2930 Waterfront and Reliance.

108. The mutual exchange of promises in the 2930 Waterfront HMA was sufficient consideration.

109. 2930 Waterfront fully performed all of its material obligations under the 2930 Waterfront HMA.

110. Reliance failed to perform its material obligations under the 2930 Waterfront HMA as described in paragraphs 65–70 above.

111. As a result of Reliance's material breach of the 2930 Waterfront HMA, 2930 Waterfront suffered damages in an amount to be determined at trial; plus, under A.R.S. §§ 12-341 and 12-341.01 and section 13.2 of the 2930 Waterfront HMA, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest.

**FOURTH CAUSE OF ACTION**
**(Breach of the 383 South Center HMA,**
**by 383 South Center Against Reliance)**

112. 383 South Center repeats the allegations above as if fully set forth here.

113. The 383 South Center HMA is a valid and binding contract between 383 South Center and Reliance.

114. The mutual exchange of promises in the 383 South Center HMA was sufficient consideration.

115. 383 South Center fully performed all of its material obligations under the 383 South Center HMA.

116. Reliance failed to perform its material obligations under the 383 South Center HMA as described in paragraphs 71–77 above.

117. As a result of Reliance's material breach of the 383 South Center HMA, 383 South Center suffered damages in an amount to be determined at trial; plus, under A.R.S. §§ 12-341 and 12-341.01 and section 13.2 of the 383 South Center HMA, its attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest.

31

## FIFTH CAUSE OF ACTION
**(Breach of Each of the HMAs Against Reliance, For Failure to Apply for Employee Retention Credits, or, in the Alternative, By Applying for and Receiving Employee Retention Credits and Improperly Keeping the Money for Itself)**

118. The Owners repeat the allegations above as if fully set forth here.

119. Each of the HMAs is a valid and binding contract between the Owners and Reliance.

120. The mutual exchange of promises in the HMAs were sufficient consideration.

121. The Owners fully performed all of their material obligations under the HMAs.

122. Reliance failed to perform its material obligations under the HMAs as described in paragraphs 1-88 above.

123. As a result of Reliance's material breach of the HMAs, the Owners suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
**(Unjust Enrichment Against Reliance, For Applying for and Receiving Employee Retention Credits and Improperly Keeping the Money for Itself)**

124. Owners repeat the allegations above as if fully set forth here.

125. Owners assert this claim solely in the alternative to the sixth cause of action above.

126. If Reliance did submit their ERC application after the HMAs expired, then Reliance has been unjustly enriched at Owners' expense, by applying for and receiving ERCs that rightfully are owed to Owners. Reliance's retention of the value of the ERCs attributable to Reliance's employees who worked at the

32

Owners' hotels during the time the HMAs were in effect has conferred a benefit to Reliance at Owners' expense.

127. This is because, as explained above, it is Owners, not Reliance, who paid for Reliance's employees' payroll and payroll expenses/taxes. Reliance's retention of the value of the ERC credits received, without payment to Owners for this amount, is inequitable.

128. Accordingly, Reliance should compensate Owners for the amount of ERCs it receives, that are attributable to its employees who worked at the Hotels.

## SEVENTH CAUSE OF ACTION
### (Money Had and Received Against Reliance, Applying for and Receiving Employee Retention Credits and Improperly Keeping the Money for Itself)

129. Owners repeat the allegations above as if set forth here.

130. Owner asserts this claim solely in the alternative to the sixth cause of action above.

131. If Reliance applied for ERCs after the HMAs expired, then it has been unjustly enriched at Owners' expense, by applying for and receiving ERCs that are rightfully owed to Owners.

132. Reliance's retention of the value of the ERCs attributable to Reliance's employees who worked at the Owners' hotels during the time the HMAs were in effect has conferred a benefit to Reliance at Owners' expense.

133. This is because, as explained above, it is Owners, not Reliance, who paid for Reliance's employees' payroll and payroll expenses/taxes.

///

33

134.     Reliance's retention of the value of the ERC credits received, without payment to Owners for this amount, is inequitable.

135.     Accordingly, Reliance s has obtained possession of money that rightfully belongs to Owners. Equity good conscience demands that Reliance pay over to Owners the amount of ERCs it receives, that are attributable to its employees who worked at the Hotels.

**WHEREFORE**, the Owners respectfully request that this Court enter judgment in their favor against Reliance on all their causes of action, awarding them damages in an amount to be determined at trial; plus, under A.R.S. §§ 12-341 and 12-341.01 and the HMAs, their attorneys' fees and disbursements incurred in bringing this action; plus pre- and post-judgment interest; plus any other and further relief as may be just and proper.

Dated: January 8, 2024

Respectfully submitted,

**WARNER ANGLE HALLAM JACKSON & FORMANEK PLC**

By: /s/ J. Henk Taylor
J. Henk Taylor (016321)
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Tel.: (602) 264-7101
Fax: (602) 234-0419
Email: htaylor@warnerangle.com

Joshua Wurtzel (*pro hac vice to be submitted*)
Jessica R. Caterina (*pro hac vice to be submitted*)
John Moore (*pro hac vice to be submitted*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway, 19th Floor
New York, New York 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
Email: jwurtzel@schlamstone.com
Email: jcaterina@schlamstone.com
Email: jmoore@schlamstone.com

*Attorneys for Defendant and Counterclaim-Plaintiffs*

35